Laura Ann **FOSSELMAN,** (C5–99–2095), Vikki Lee **Lindstrom,** (C7–99–2096), Linda Carol **Hughes,** (C9–99–2097), **Relators.**

v.

**COMMISSIONER OF HUMAN SERVICES, Respondent.**

Nos. C5–99–2095, C7–99–2096, C9–99–2097.

Court of Appeals of Minnesota.

July 3, 2000.

458

Kevin M. Lindsey, St. Paul, MN (for relators).

Mike Hatch, Attorney General, Theresa Meinholz Gray, Assistant Attorney General, St. Paul, MN (for respondent).

Samuel D. Orbovich, Orbovich & Gartner Chartered, St. Paul, MN (for amicus curiae Association of Residential Resources in Minnesota).

Considered and decided by KALITOWSKI, Presiding Judge, WILLIS, Judge, and PORITSKY, Judge.

## OPINION

BERTRAND PORITSKY, Judge.*

The Department of Human Services (DHS) disqualified relators from employment in positions allowing direct contact with persons receiving services from (1) programs licensed by DHS or the Department of Health or (2) unlicensed personal-care-provider programs. DHS based relators' disqualifications on their failure to report the maltreatment of a child that allegedly occurred at an intermediate-care facility where relators were employed. Respondent Commissioner of Human Services denied relators' requests for reconsideration in separate decisions, and they have petitioned this court for writs of certiorari. We have consolidated their appeals.

Relators assert that they are entitled to a fair hearing pursuant either to statute or the Due Process Clause. They further contend that (1) the commissioner's determination that relators had a duty to report maltreatment is not supported by substantial evidence; (2) the commissioner failed to conclude that the alleged maltreatment caused the child's death or caused her serious injury; (3) the commissioner violated relators' due process rights by applying collateral estoppel to the issue of whether maltreatment occurred in the facility; and (4) the commissioner's decisions were arbitrary and capricious. The commissioner has filed a motion to strike certain documents in relators' appendix that are not contained in the record. We reverse the commissioner's decisions disqualifying relators and remand, and we grant the commissioner's motion to strike.

## FACTS

Relators Laura Ann Fosselman and Vikki Lee Lindstrom are registered nurses, and Linda Carol Hughes is a qualified mental retardation professional (QMRP). Relators are employed by AXIS Minnesota, Inc., a residential, intermediate-care facility for individuals with developmental disabilities.

R.W. was a resident at AXIS. At approximately 3:30 p.m. on February 6, 1998, C.B., a nurse at AXIS, received a call from R.W.'s school requesting that someone from the facility pick up R.W. because

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

R.W. was extremely agitated. C.B. went to the school, administered chloral hydrate to R.W. to alleviate R.W.'s agitation, and brought her back to AXIS. C.B. then monitored R.W. every 15 minutes. At approximately 8:15 p.m., C.B. activated the emergency alarm after noticing R.W. was not breathing. Neither the facility's nurses nor the paramedics, who arrived a short time later, were able to revive R.W., and she was pronounced dead.

Fosselman was on duty the evening of R.W.'s death, and she assisted C.B. in preparing a report on what occurred with R.W. that evening. Lindstrom and Hughes were not on duty that night. A few days later, the three relators spoke to two other nurses about the other nurses' concerns regarding the care R.W. received on February 6. Relators expressed their determination that C.B. had complied with the orders of R.W.'s physician. Relators did not report maltreatment to outside authorities.

The Department of Human Services (DHS) disqualified relators from working in direct contact with individuals receiving services from (1) programs licensed by DHS or the Department of Health or (2) unlicensed personal-care-provider organizations. Each relator filed a request for reconsideration of the disqualification with the Commissioner of Human Services. The commissioner denied relators' requests for reconsideration, and relators appealed.

## ISSUES

1. Does the right to procedural due process entitle relators to an agency hearing under Minn.Stat. § 256.045, subd. 3(a)(6) (1998)?

2. Did the commissioner make an error of law in disqualifying relators for failure to report serious maltreatment when the commissioner made no finding that the alleged maltreatment caused R.W.'s death or caused serious injury or harm to her?

3. Should the commissioner's motion to strike documents in relators' appendix be granted?

## ANALYSIS

■ A quasi-judicial agency decision not subject to the Administrative Procedure Act (APA) is reviewed on writ of certiorari by inspecting the record to determine whether the decision was " 'arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it.' " *Rodne v. Commissioner of Human Servs.*, 547 N.W.2d 440, 444–45 (Minn.App.1996) (quoting *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn.1992) (other quotations omitted)).

### I.

■ We first address relators' assertion that they have a statutory right to a hearing. There are two statutory provisions that might grant a hearing to an individual disqualified from direct-contact positions under Minn.Stat. § 245A.04, subd.3d(4) (Supp.1999), for failure to report child maltreatment. The first, Minn.Stat. § 245A.04, subd. 3c (1998), provides, in effect, that public employees may request contested case hearings under the APA. This provision does not apply here, however, because relators are not public employees.[1] The second statute, Minn.Stat. § 256.045 (1998), provides for "state agency" hearings to review DHS matters.

Relators rely on the latter statute, section 256.045, subdivision 3(a)(6), and claim that they are entitled to a state agency hearing. They do not dispute that subdivision 3 of the statute contains a list of persons expressly entitled to such hearings. They also do not dispute that per-

---

1. In any case, in *Rodne*, 547 N.W.2d at 444, this court noted that DHS is not required to conduct a contested case proceeding when an individual who is not subject to Minn.Stat. § 245A.04, subd. 3c, requests reconsideration under Minn.Stat. § 245A.04, subd. 3b (1998), as did relators in this case.

sons accused of failing to report maltreatment, such as relators, are not expressly mentioned in the list. However, they point to subparagraph (6) of subdivision 3, which grants a hearing to "any person to whom a right of appeal according to this section is given by other provision of law" and argue that the Due Process Clauses of the United States and Minnesota Constitutions are "other provision[s] of law" within the meaning of the statute. Alternatively, they argue that if they are not granted a statutory right to a hearing, then the statutory scheme is unconstitutional in that it deprives them of procedural due process.

 It is a cardinal rule of construction that, when reasonably possible, a statute must be construed so as to uphold its constitutionality. *Minnesota Higher Educ. Facilities Auth. v. Hawk,* 305 Minn. 97, 103, 232 N.W.2d 106, 110 (1975) ("Statutes are to be construed so as to uphold their constitutionality." (Citations omitted)); *see also* Minn.Stat. § 645.17(3) (1998) (stating legislature does not intend to violate state or federal constitution). If the failure to grant relators a hearing did in fact deprive them of due process, then, if possible, the statute must be construed to grant them such a hearing. If the statute cannot be so construed, then the statute must be declared unconstitutional. Either way, therefore, it comes down to the same issue: Did the failure to grant relators a hearing deprive them of due process?

In disqualifying relators, the commissioner proceeded in the following manner:

First, upon receiving a complaint that there had been maltreatment of R.W., Mary Kelsey, an investigator with the DHS Licensing Division, conducted an investigation, which concluded that C.B. had maltreated R.W. by failing to provide her with medical care.

Second, Jackie Spies, supervisor of the Licensing Division, made a five-point determination, as to each relator, based on Kelsey's report: (1) relators were mandated reporters; (2) they had reason to believe that R.W. had been maltreated; (3) relators failed to report the maltreatment; (4) the maltreatment was substantiated; and (5) the maltreatment was recurring. Based on this determination, relators were disqualified by a letter over Spies's signature.[2]

Third, relators exercised their right to request the commissioner to reconsider their disqualification. DHS, through Spies's letter, informed relators that they could request reconsideration. But the letter stated that the commissioner would only consider three grounds: (1) whether the information upon which DHS relied was incorrect; (2) whether the maltreatment was not recurring; or (3) whether relators would not pose a risk to persons served by AXIS. *See* Minn.Stat. § 245A.04, subd. 3b(a) (1998) (stating individual requesting reconsideration must present information demonstrating information commissioner relied on is incorrect or inaccurate or demonstrating individual does not pose risk of harm to persons served by applicant or license holder). Relators were allowed to submit written material in support of their position.

Fourth, after completing the "correctness review," the commissioner affirmed relators' disqualifications.

Certain aspects of the above procedure should be noted. At no stage were relators given the opportunity to present oral testimony on their behalf or to confront and cross-examine the individuals who pro-

**2.** In his brief, the commissioner states that the Licensing Division Investigations Unit performed the initial investigation and that the Investigations Unit then referred the matter to the Licensing Division Background Studies Unit, which made the five-point determination supporting relators' disqualification. We can find no explanation of this process in the record or in the applicable statutes or rules, and we can find no support for the commissioner's statement that two separate units of the Licensing Division were involved in this matter.

vided the information adverse to them. They did not have the power to subpoena persons to give information on their behalf. Moreover, under Minn.Stat. § 245A.04, subd. 3b(a)(1), once the commissioner has issued a final order in an appeal from a maltreatment determination or disposition, "the commissioner's order is conclusive on the issue of maltreatment." Thus, in this case, once DHS determined in C.B.'s case that C.B. was guilty of maltreatment—a determination that C.B. did not contest— under the statute, relators could not contest this issue in their own disqualification proceedings.

■ With respect to relators' due process argument, the first issue is whether disqualification proceedings are subject to due process requirements. At the onset, we note that the due process protections granted under the United States and Minnesota Constitutions are identical. *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn.1988).

In defining those areas in which governmental action is restricted by procedural due process, the United States Supreme Court has stated:

> Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.

*Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976).

In *Mathews*, the Court noted that an individual could not be deprived of Social Security benefits without procedural due process. *Id.* (recognizing continued receipt of these benefits is statutorily created property interest protected by Fifth Amendment). In *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971), the Court held that if a driver's license is essential to one's livelihood, any proceeding to suspend that license must be consistent with procedural due process. This court stated in *Humenansky v.*

*Minnesota Bd. of Med. Exam'rs*, 525 N.W.2d 559, 566 (Minn.App.1994), *review denied* (Minn. Feb. 14, 1995), "A license to practice medicine is a property right deserving constitutional protection." (Citing *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959) (other citations omitted).) Relators, two of whom are RNs and one of whom is a QMRP, clearly have a property interest in working in direct-contact positions.

Not only are relators' property interests involved, but the courts have also recognized that if a person's good name, reputation, honor, or integrity is at stake because of governmental action, the person is entitled to procedural due process. *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *see also Boutin v. LaFleur*, 591 N.W.2d 711, 718 (Minn.1999) (recognizing liberty interest is implicated when loss of reputation is coupled with loss of another tangible interest), *cert. denied,* —— U.S. ——, 120 S.Ct. 417, 145 L.Ed.2d 326 (1999). Because relators have been disqualified for alleged failure to carry out the provisions of a law embodying an important policy—that of protecting children's health and welfare— it is clear to us that disqualification has tainted their good names and reputations.

The commissioner all but concedes on appeal (1) that relators have a protected property interest in holding their jobs free from unreasonable governmental interference and (2) that they have a protected liberty interest in protecting their names and associations in the community and in protecting their freedom to pursue future employment opportunities involving direct contact with persons served by certain programs. We conclude that disqualification proceedings are subject to the requirements of procedural due process.

■ Having reached that conclusion, we turn to the second issue: Did the procedure by which relators were disqualified deprive them of due process? "The fundamental requirement of due process is the opportunity to be heard at a meaning-

ful time and in a meaningful manner." *Mathews*, 424 U.S. at 333, 96 S.Ct. at 902 (quotation omitted). In *Mathews*, the Court identified the distinct factors that should be considered ·in determining the specific dictates of due.process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest, through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the· fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903 (citation omitted).

The first of the *Mathews* factors, relators' private interest, weighs ·heavily in their favor. According to relators, their disqualification both precludes them from working in their chosen field for seven years and renders their opportunity to re-enter that field at the discretion of the commissioner.[3] *See Bell*, 402 U.S. at 539, 91 S.Ct. at 1589 (holding if driver's license is essential to one's livelihood, any proceeding to suspend that license must be consistent with due process); *Falgren v. State, Bd. of Teaching*, 545 N.W.2d 901, 909 (Minn.1996) (noting revocation of teaching license affects ability to work in chosen profession and quoting United States Supreme Court, " 'the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood.' " (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985))); *Humenansky*, 525 N.W.2d at 566 ("A license to practice medicine is a property right deserving constitutional protection.").

3. Although Minn.Stat. § 245A.04, subd.3d(4), is not clear on this point, we conclude that relators have given a plausible reading to the

The second *Mathews* factor—risk of erroneous deprivation of relators' ability to work in their chosen profession and the probable value of additional procedural safeguards—also weighs heavily in favor of relators. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), is instructive on this score.. In *Goldberg*, the Court held that the New York procedure for. terminating welfare benefits, before giving recipients . the opportunity for an evidentiary hearing, denied recipients due process. *Id.* at 268, 90 S.Ct. at 1021. After noting that due process requires the opportunity to be heard and that the hearing must be at a meaningful time and in a meaningful manner, the Court held that the failure to grant recipients the opportunity to present evidence orally or to confront and cross-examine adverse witnesses was "fatal to the constitutional adequacy" of the New York procedures. *Id.* at 267–68, 90 S.Ct. at 1020–21. In regard to the issue of oral versus written presentations, the Court first noted that many welfare recipients may not have the education to write effectively. *Id.* at 269, 90 S.Ct. at 1021. Then, as relates to the instant cases, the Court made two observations. First, the Court said:

> Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important.. Particularly where credibility and veracity are at issue, as they must be in many [welfare] termination proceedings, written submissions are a wholly unsatisfactory basis for decision.

*Id.* Second, the Court said:

> In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine witnesses.

*Id.* While credibility is an essential issue in welfare ·termination cases, as the Court

statute, which, in ˙determining the extent of the harm to relators, must be credited.

noted, it is no less important in disqualification proceedings, where much of the evidence for failure to report maltreatment may well come from a perpetrator of the maltreatment.

In the instant cases, before the maltreatment determination and their subsequent disqualification, the only opportunity relators had to give their side was when they were interviewed by a DHS investigator. It is not clear from the record whether relators were told they were the subject of the investigation or were told what specific allegations had been made against them. It may have appeared to relators that C.B. was the subject of the investigation. Only after they were formally disqualified were relators given an opportunity to submit written evidence in connection with their request for reconsideration. At no point in the proceedings were relators given the opportunity to present oral testimony, to confront and cross-examine witnesses against them, or to subpoena witnesses on their behalf. Disqualification proceedings—which involve questions of whether an individual was maltreated and whether the mandated reporter knew or had reason to know of the maltreatment—may well be as fact intensive as welfare termination proceedings and thus have the same need for the procedural safeguards noted in *Goldberg.*

As to the conduct of a hearing, we have noted above that under Minn.Stat. § 245A.04, subd. 3b(a)(1), once the commissioner has issued a final order in an appeal from a maltreatment determination or disposition, "the commissioner's order is conclusive on the issue of maltreatment." In the case involving the nurse, C.B., DHS had determined that C.B. was guilty of maltreatment—a determination that C.B. did not contest—and as a result, under the statute relators could not contest this issue in their disqualification proceedings. Preventing an individual from challenging an essential fact on which the government bases an adverse action may result in a denial of due process.

In *Bell,* 402 U.S. at 537, 91 S.Ct. at 1588, Bell was a clergyman who needed his car to travel to the various rural Georgia localities within his ministry. He was involved in an auto accident but apparently did not have liability insurance. *Id.* He was thereafter informed by the Director of the Georgia Department of Public Safety that he was required either to post security in an amount sufficient to cover potential liability or to present a notarized release from liability, plus he was to file proof of future financial responsibility. *Id.* If he failed to comply with these requirements, his driver's license would be suspended. *Id.* Bell requested an administrative hearing before the director, asserting that he was not at fault for the accident and was therefore not liable for damages resulting from it. *Id.* At the administrative hearing, Bell's proffer of evidence on the issue of liability was rejected on the ground that the applicable statute did not recognize absence of liability as an excuse for not ·complying with the financial requirements noted above. *Id.* at 538, 91 S.Ct. at 1589. The Georgia Superior Court ruled in Bell's favor, but the Georgia Court of Appeals reversed. *Id.* On review, the United States Supreme Court reversed and held that it was a denial of due process to foreclose Bell from raising the issue of liability. *Id.* at 543, 91 S.Ct. at 1591. The Court ruled:

> Since the statutory scheme makes liability an important factor in the State's determination to deprive an individual of his licenses, the State may not, consistently with due process, eliminate consideration of that factor in its prior hearing.
>
> The hearing required by the Due Process Clause must be meaningful, and appropriate to the nature of the case. It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet this standard.

*Id.* at 541–42, 91 S.Ct. at 1590–91 (citations and quotations omitted).

▉ This principle is controlling in the instant cases. Relators, like Bell, are unable to pursue their chosen occupations by reason of the state administrative action, and the Minnesota statute, as did the Georgia procedure, "excludes consideration of an element essential to the decision." To the extent that Minn.Stat. § 245A.04, subd. 3b(a)(1), takes DHS's determination that C.B. was guilty of maltreatment and makes it conclusive upon relators, the statute denies due process.

Finally, we note that as a measure of what due process requires, the legislature has provided that persons determined to have actually committed maltreatment are granted a right to a hearing after exercising a right to reconsideration by the commissioner. *See* Minn.Stat. §§ 256.045, subd. 3(a)(8) (stating individual determined to have maltreated child has right to hearing after exercising right to reconsideration by commissioner), 626.556, subd. 10i (Supp.1999) (stating if commissioner determines individual maltreated child, individual may request agency reconsideration). At such a hearing, the accused individual has these rights: to have counsel; to appear personally, testify, and offer evidence; and to examine and cross-examine witnesses. Minn.Stat. § 256.045, subd. 4. Parties to DHS agency hearings also have the right to obtain subpoenas to compel

witnesses to appear. Minn.Stat. § 256.045, subd. 6(b). A maltreatment determination may be used to support disqualification from direct-contact positions only after the commissioner enters a final order pursuant to this review process and after DHS determines that such maltreatment was recurring or serious. *See* Minn.Stat. § 245A.04, subd. 3b(a)(1) (stating commissioner's order conclusive on issue of maltreatment if commissioner has issued final order in appeal under Minn.Stat. § 256.045), subd.3d(4) (listing "substantiated serious or recurring maltreatment of a minor under 626.556 * * * for which there is a preponderance of evidence that the maltreatment occurred" as reason for disqualification). As noted above, the commissioner's position in the instant proceeding is that individuals accused of failing to report maltreatment, such as relators, do not have a right to a hearing. This position ironically grants greater procedural protections to persons who actually perpetrate maltreatment than to those individuals who merely fail to report it.[4]

Turning to the third *Mathews* factor, the government's interest, the government's primary interest here lies in protecting individuals being treated in direct-contact facilities. Due to statutory options granted to the commissioners, this interest would not be obstructed by providing a hearing. Those options include

---

4. In the unpublished opinion, *J.L.H. v. Commissioner of Human Servs.*, No. C2–97–316, 1997 WL 435877, at *1 (Minn.App. Aug.5, 1997), J.L.H. was disqualified from working in direct-contact positions as a result of committing maltreatment while working in a DHS-licensed facility. J.L.H. argued, in part, that she was not afforded procedural due process. *Id.* at *3. This court disagreed and concluded that the reconsideration procedure that allowed her to submit written information to the commissioner afforded her due process. *Id.* at *4.

The law regarding suspected perpetrators of maltreatment changed immediately before this court filed *J.L.H. See* 1997 Minn. Laws ch. 203, art. 5, § 29 (adding Minn.Stat. § 626.556, subd. 10i, which permits individual determined to have maltreated child to

request reconsideration), 1997 Minn. Laws ch. 203, art. 5, § 6 (adding subsection (8) to Minn.Stat. § 256.045, subd. 3; subsection provides individual determined to have maltreated minor has right to state agency hearing after exercising right to reconsideration; provision applies only to maltreatment occurring on or after July 1, 1997). Although J.L.H. did not receive these additional procedural protections because her actions took place before the statute's effective date, the legislature's decision to change the law and grant suspected perpetrators of maltreatment the right to challenge a maltreatment determination, both through a request for reconsideration and a subsequent request for an agency hearing, reflects legislative recognition of the need for due process in such cases.

placing individuals who request a hearing on restricted status or removing them from direct-contact positions pending the hearing's outcome. *Cf.* Minn.Stat. § 245A.04, subd. 3a(b) (Supp.1999) (describing procedures pending reconsideration decisions including: immediate removal of disqualified individuals posing imminent risk of harm; restrictive status for those posing some risk; and no change in status for those posing no imminent risk of harm). The government has an additional interest in avoiding the cost and administrative burden of providing individuals disqualified from working in direct-contact facilities with a hearing. Requiring some form of hearing will undoubtedly increase costs and be an added burden to DHS. The burden on the department is lessened, however, because DHS already has procedures in place for hearings in other human services cases. *See* Minn.Stat. § 256.045 (describing procedures for review of human services matters). These procedures include the existing power of the commissioner to appoint state human services referees to conduct state agency hearings. *Id.*, subd. 1. Although this *Mathews* factor weighs against granting relators an agency hearing, its weight is not significant, and it is clearly outweighed by the other two *Mathews* factors.

We conclude that (1) Minn.Stat. § 256.045, subd. 3(a)(6), affords a statutory right to a hearing where due process rights would otherwise be violated; (2) disqualification proceedings are subject to procedural due process protections; and (3) consideration of the *Mathews* factors yields the conclusion that due process requires that relators receive an agency hearing. Therefore, we reverse and remand the commissioner's decisions.

## II.

Because we are remanding these cases to the commissioner for further proceedings, it is essential to address relators' claim that the commissioner committed an error of law in his decisions. Specifically, relators assert that the commissioner erred in disqualifying them without first finding that C.B.'s alleged maltreatment caused R.W.'s death or caused serious injury or harm to her.

After completing a background study, DHS may disqualify individuals from working in any position allowing direct contact with persons receiving services from programs licensed by DHS or the Department of Health or from unlicensed personal-care-provider organizations. *See* Minn.Stat. §§ 144.057 (1998) (stating background studies for Department of Health shall be conducted by DHS), 245A.04, subd. 3 (1998) (describing DHS background studies and stating employees providing direct-contact services in personal-care-provider organizations shall also be studied), 245A.04, subd.3d (Supp.1999) (stating, after background study, individual may be disqualified from positions allowing direct contact with persons receiving services from license holder). In order to disqualify an individual for failing to report maltreatment of a child, the commissioner must make an administrative determination that includes all of the following elements:

1. The individual was a mandated reporter under Minn.Stat. § 626.556, subd. 3 (Supp.1999);

2. The individual knew or had reason to know that a child was maltreated;

3. The maltreatment was substantiated;

4. The maltreatment was recurring or serious; and

5. The individual failed to make the required report.

*See* Minn.Stat. §§ 245A.04, subd.3d(4) (stating individual disqualified from positions involving direct contact if there is administrative determination that individual failed to make reports required under section 626.556, subdivision 3, where maltreatment was substantiated and maltreat-

ment was recurring or serious), 626.556, subd. 3 (identifying mandated reporters).

With respect to the elements listed above, it is undisputed that relators are mandated reporters and that they did not report C.B.'s alleged maltreatment of R.W. The commissioner concluded that relators had reason to know of the maltreatment and that the maltreatment was substantiated. Relators contest the commissioner's conclusions on the latter two elements, but their argument on this score focuses on the remaining element: Based on the commissioner's findings, the commissioner could not draw the conclusion that C.B.'s maltreatment of R.W. was recurring or serious.

Initially, DHS concluded that C.B.'s maltreatment was "recurring." The record does not support the conclusion that C.B. was guilty of recurring maltreatment with respect to R.W. The commissioner realized that it was erroneous to label the maltreatment as "recurring," and in his final orders he changed the characterization of maltreatment from "recurring" to "serious."

At no point in his orders did the commissioner make a finding that C.B.'s conduct caused R.W.'s death or caused serious injury or harm to her. In fact, the commissioner made an express finding that the DHS investigation did not establish such causation. In his findings, the commissioner quoted Mary Kelsey's report, which included the following, "The investigation did not establish the extent to which [C.B.'s] failure to supply [R.W.] with medical care contributed to [R.W.'s] death." In conclusion seven of each order, the commissioner concluded, "The DHS investigation did not establish the extent to which [C.B.'s] failure to supply [R.W.] with medical care contributed to [R.W.'s] death."

Relators point to the definition of "serious maltreatment" found in Minn.Stat. § 245A.04, subd.3d(4), which is, insofar as it pertains to this case,

maltreatment resulting in death; or maltreatment resulting in serious injury or harm which reasonably requires the care of a physician whether or not the care of a physician was sought.

Relators argue that since the commissioner did not establish the extent to which C.B.'s maltreatment (i.e., failure to supply R.W. with medical care) contributed to R.W.'s death or caused her serious injury, the necessary causation is missing. That is, absent abuse, to be serious maltreatment under the statute, the maltreatment must result in serious injury or death. Thus, relators conclude, the necessary statutory element is missing, and the disqualification for failure to report serious maltreatment is legally unfounded.

The commissioner responds to this argument by pointing to the following language, also found in conclusion seven:

However, [R.W.] was in respiratory distress that reasonably required the care of a physician whether or not the care of a physician was sought. Under Minn. Stat. § 245A.04, subd.3d(4) maltreatment resulting in death or maltreatment resulting in serious injury or harm which reasonably requires the care of a physician whether or not the care of a physician is sought is serious maltreatment

But what the statute requires is that the *maltreatment* cause the death or the serious injury or harm requiring the physician's care. Conclusion seven states that the *underlying condition*—R.W.'s respiratory distress—not the maltreatment, caused the need for a physician's care. In his brief, the commissioner attempts to bridge the gap:

C.B.'s neglect was serious because the child needed medical care to improve her condition. C.B.'s failure to follow the physician's orders and risk management plan and his failure to notify the child's doctor of her deteriorating condition *caused her to continue to experience agitation and respiratory distress* that reasonably required the care of a physician.

(Emphasis added.) As noted above, however, the commissioner did not make a finding that C.B's conduct caused any change in R.W.'s condition, and, in point of fact, he ruled expressly that the investigation did not make a finding that C.B.'s conduct caused R.W's death. R.W. had, in fact, numerous health problems, which had resulted in five hospitalizations between July 1997 and January 1998, and which are detailed in the DHS report dated October 29, 1998. Dr. Terence J. Coyne, R.W.'s treating physician, submitted to the commissioner an affidavit dated February 8, 1999, in which Dr. Coyne stated that he reviewed his orders and the records in connection with R.W.'s care, treatment, and medication. Dr. Coyne went on to state, "The actions taken and documented were consistent with my orders." From all that appears in the record, it appears as likely that R.W.'s death resulted from her underlying condition as from any inaction on C.B.'s part. In light of (1) the commissioner's express finding that a link between C.B.'s conduct and R.W.'s death was not established, and (2) the commissioner's failure to find that C.B.'s alleged maltreatment caused R.W.'s death or caused serious injury or harm to her, his conclusion that C.B. was guilty of serious maltreatment is not supported by his findings and is thus an error of law.

### III.

█ The commissioner requests that this court strike certain documents contained in relators' appendix. The commissioner moves to strike Dr. Coyne's second affidavit, dated January 7, 2000; a stipulation-and-consent order between C.B. and the Board of Nursing; a memorandum from the Office of the Ombudsman for Mental Health and Mental Retardation; and two letters from the Board of Nursing.

As the commissioner correctly observes, these documents are not contained in the file. There are also additional documents in relators' appendix that are not contained in the file, including (a) an affidavit from relators' attorney; (b) two letters from relators' attorney to the commissioner; and (c) a letter from an assistant commissioner to relators' attorney.

The record on certiorari review includes the documents filed with the agency. See Minn. R. Civ.App. P. 110.01 (stating record on appeal includes papers filed in trial court, exhibits, and transcript), 115.04, subd. 1 (applying provisions of rule 110 to certiorari review and stating references to trial court shall be read as references "to body whose decision is to be reviewed"). Thus, the documents in relators' brief that are not contained in the record are stricken, and the commissioner's motion is granted. See Mitterhauser v. Mitterhauser, 399 N.W.2d 664, 667 (Minn.App.1987) (reviewing court must strike matters outside record). Our decision to strike these documents does not preclude relators from introducing them on remand. Both relators and DHS shall have the opportunity to introduce additional evidence on remand.

### DECISION

The commissioner's failure to grant relators a state agency hearing deprived them of due process. Pursuant to the rule that if possible a statute must be construed to preserve its constitutionality, we conclude that the phrase, "other provision of law" appearing in Minn.Stat. § 256.045, subd. 3(a)(6) (1998), is to be construed to include due process. To the extent this conclusion is inconsistent with Minn.Stat. § 245A.04, subd. 3b(e) (1998), which states that the commissioner's decision on reconsideration of a disqualification decision is the final administrative agency action, we conclude that this provision denies relators due process.

The commissioner also erred as matter of law when he concluded that R.W. was the subject of serious maltreatment yet did not first determine that C.B. caused R.W.'s death or caused serious injury or harm to her. Although the commissioner is not precluded on remand from conclud-

ing that R.W. was the subject of serious maltreatment, such a conclusion must be supported by a determination that C.B.'s actions caused R.W.'s death or caused serious injury or harm to R.W. Because of our decision on the foregoing issues, we need not address the additional issues raised by relators.

The Commissioner of Human Services' decisions denying relators' requests for reconsideration are reversed. These matters are remanded to the commissioner for further proceedings consistent with this decision.

Additionally, we grant the commissioner's motion to strike documents contained in relators' appendix that are not contained in the agency file.

**Reversed and remanded; motion granted.**