*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C.D., Minor.

UNPUBLISHED
August 17, 2023

No. 364442
Alpena Circuit Court
Family Division
LC No. 20-007536-NA

Before: YATES, P.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

Respondent-appellant, father of the minor child, appeals as of right the order entered of the family division of the circuit court terminating his parental rights to that child.[1] On appeal, respondent contends there was insufficient evidence to support a statutory ground for termination, and termination was premature because petitioner did not make reasonable family reunifications efforts. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

In August of 2020, the minor child was removed from her mother's care because the mother was abusing, manufacturing, and selling methamphetamine inside the trailer where they resided. The allegations included that the residence was filthy and without electricity, and that the minor child was not cared for while mother slept long hours during the day. In June, 2019, respondent was arrested, causing the minor child to be placed in nonrelative foster care. Following mother voluntarily relinquishing her parental rights, caseworkers investigated possible relative placement. However, it was not until February 18, 2021, that the trial court determined respondent was the minor child's biological and legal father. On March 25, 2021, the trial court acquired jurisdiction in connection with respondent after he admitted that he was convicted of two counts of delivery or manufacture of methamphetamine, and currently incarcerated with an earliest release date of June 2, 2024, and a latest release date of June 2, 2039.

---

[1] The child's mother voluntarily relinquished her parental rights and is not participating in this appeal.

At the April 15, 2021 dispositional hearing, respondent was ordered to comply with, and benefit from a parent agency treatment plan. Treatment goals included achieving and maintaining a drug-free lifestyle and acquiring adequate parenting skills. The trial court thereafter conducted several periodic review and permanency planning hearings. At the March 2022 permanency planning hearing, the court adopted petitioner's recommendation, which the minor child's lawyer-guardian ad litem (LGAL) supported, to change the goal from reunification to adoption, and directed petitioner to file a supplemental petition to terminate respondent's parental rights. However, petitioner was to continue to explore possible relative placement.

Petitioner filed a supplemental petition in July 2022, and the trial court terminated respondent's parental rights after a hearing in November 2022. This appeal followed.

## II. ANALYSIS

A trial court need only find that one statutory ground has been proved to support termination of parental rights. *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013). In this case, the trial court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (*ii*), (g), (h) and (j), which state in pertinent part as follows:

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

\* \* \*

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(h) The parent is in prison for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care

and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

This Court reviews a finding that a statutory ground for termination has been proved by clear and convincing evidence for clear error. MCR 3.977(K); *In re White*, 303 Mich App 701, 709-710; 846 NW2d 61 (2014). To be clearly erroneous, a finding must be more than possibly, or even probably, wrong; a finding is clearly erroneous when, although there is evidence to support it, upon review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake has been made. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009) (quotation marks and citation omitted). However, unpreserved claims of error are reviewed for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).

In his appeal, respondent asserts that petitioner and the trial court failed to provide him with adequate services and that his parental rights were terminated solely on the basis of his incarceration, as prohibited by *In re Mason*, 486 Mich 142; 782 NW2d 747 (2010). It is well established that petitioner is required to make reasonable efforts to reunify a family before terminating parental rights, unless aggravated circumstances are present such as severe physical abuse. MCL 712A.19a(2); MCL 722.638. However, "'The time for asserting the need for accommodation in services is when the court adopts a service plan . . . .'" *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012), quoting *In re Terry*, 240 Mich App 14, 27; 610 NW2d 563 (2000). Respondent does not assert, or provide record citations to show that he expressed any such need. Accordingly, we review his appellate objection that petitioner failed to provide adequate reunification services for plain error that affected the outcome. See *In re Utrera*, 281 Mich App at 9.

In *Mason*, the father was expected to be released from prison approximately seven months after the permanency planning hearing, and four months after the termination hearing, thus his release was imminent. He had entrusted a suitable relative with the custody and care of his children. Further, the father in *Mason* had an established relationship with his children, and had supported his family by working in construction until he was incarcerated. *Id*. at 147. He further had a construction job waiting for him upon his release, along with previously suitable housing with the children's mother. *Id*. at 150. The father in *Mason* was not offered the opportunity to participate in any of the termination proceedings for more than 16 months. *Id*. at 147-148. A caseworker who had never spoken with the father concluded, without supporting reasoning, that it would take six months from his release to him comply with a service plan. *Id*. at 150.

Here, the trial court distinguished this case from *Mason*, initially finding that respondent's release from prison was not imminent. Although respondent's imprisonment, plus restrictions put in place in response to the COVID-19 pandemic, had an impact on petitioner's ability to coordinate services under two parent-agency treatment plans, the evidence showed that caseworkers actively endeavored to overcome these limitations by contacting the two prisons where respondent was

incarcerated to facilitate any available services. The prison facilities, as is typically the case, provided minimal cooperation. At the termination hearing, caseworker K. testified that she "had to get creative," and mailed respondent parenting-class worksheets, which he completed and returned in pre-stamped envelopes. Caseworker H. explained that it was difficult to provide services in a men's prison and so did not provide in-person services to respondent. She further explained that she received no response from the prison regarding the availability of parent-education webinars, and so sent parenting information and articles that applied to the child's age and development. According to caseworker H., that was the only service petitioner was able to provide to respondent in prison. Caseworkers also coordinated written exchanges between the minor child and respondent, and regular updates, including photos, from the caseworker and the foster mother. Although petitioner typically did not allow a young child to participate in prison visits, the caseworkers' multiple attempts to facilitate video visits were thwarted by prison rules and respondent's move to another facility. Even so, caseworkers coordinated DNA paternity testing, assured respondent's participation in family team meetings by telephone, and actively sought to find a suitable placement for the child with family members. To respondent's credit, he sought out services to help with his drug addiction, including Alcoholics Anonymous and Narcotics Anonymous meetings, individual counseling, and a substance-abuse program, and was working toward completing a GED. Hence, the record makes clear that petitioner did provide respondent with services, and respondent, for the most part, availed himself of those services.

Furthermore, the trial court noted that it ordered petitioner to initiate termination proceedings following the March 10, 2022, permanency planning hearing, which was more than two years before respondent's earliest possible parole date of June 2, 2024. The supplemental petition was filed on July 8, 2022, which was 23 months before that date. Further, the trial court found, at the time of the November 2022 termination hearing, the child was nearly three years old, and had been in nonrelative foster care for more than two years, the vast majority of the minor child's life.

Moreover, respondent was not prevented from participating in the proceedings below, and in fact actively participated in all the hearings. In the few instances where he was unavailable, the hearing was adjourned to allow for his participation. He also participated in family team meetings, and was given updated parent-agency treatment plans for his review and signature. Nonetheless, caseworker H. opined that respondent would not be able to properly care for the minor child for several months after his release. It is undisputed that respondent had an extensive criminal and drug-abuse history. Hence, even if he completed all available services, including attending Narcotics Anonymous and Alcoholics Anonymous meetings, a substance-abuse program, and individual counseling, and had not used any drugs while incarcerated, the evidence indicated that it would take several months for him to prove that he had benefited from services and could maintain sobriety outside of a rigid prison system. Caseworker H. explained that, upon respondent's release, he would need to comply with, and benefit from, a new parent-agency treatment plan to address barriers relating to housing, employment, substance-abuse, parenting time, parenting education, and building a relationship with the child. Caseworker H. estimated that it would take at least six to eight months from respondent's release before family reunification could be considered. This timeframe was not speculative, as it was in *Mason*. Rather, it was based

on the caseworker's thorough knowledge of the case, which included interactions with respondent, and her 15 years of experience working for petitioner.

And the record plainly shows that respondent had no history of providing appropriate custody and care for the minor child. After the latter's removal from her mother's care, respondent initially provided names of several family members for possible relative placement. Caseworker K. made several attempts to contact them, including by sending inquires by certified mail, but only the minor child's paternal grandfather responded.

We further conclude that the trial court did not clearly err in finding that respondent's family members were unsuitable to care for the minor child while he was in prison. Four placement hearings were held to determine if the minor child could properly be placed with a relative. The record supports the trial court's finding that the paternal grandfather was not a suitable caregiver for the minor child. A safety screen revealed that he had a significant criminal history, including a recent conviction of resisting and obstructing a police officer. Caseworker K. reviewed all police reports from every offense and discussed them personally with the paternal grandfather. She found it troubling that he denied most of the offenses, stating that he had been targeted by the police, or made light of the incidents, and was unremorseful and angry. Moreover, the evidence showed that he had a very strong disdain for authority, as he revealed during interactions with the court and caseworkers, particularly during one grandparent visit during which he was so hostile that a deputy had to escort him out of petitioner's office building. Although the paternal grandfather was caring for his young daughter, Caseworker K. explained that there were important difference between caring for one's own child and caring for a child in foster care under petitioner's supervision. Caseworker K. explained as follows:

> [B]ecause of his unwillingness and his lack of cooperation with any type of authority I believe that it would put [the minor child] at a substantial risk of harm if [the minor child] were to be placed with him because I would fear that he would not follow the rules that need to be followed. That he would not be truthful and honest about things that he needs to be truthful and honest with, with me. And so because of all of those things taken into, taken into account we had to deny him for placement.

The proofs showed that respondent was unable to identify other relatives for possible placement, as the caseworkers regularly requested. In November 2021, he stated that there were no other placement options. Five months later, respondent's cousin expressed an interest in caring for the minor child, although respondent had never mentioned that cousin for that purpose. Caseworker H. sent response forms for the cousin to complete, and completed a courtesy home study on April 8, 2022. At that time, the minor child had been in care with one foster family for more than 18 months. Testimony revealed that the minor child had bonded with her foster family and had some difficulties following respondent's cousin's visits.

Although the home study held promise that respondent's cousin could care for the minor child, it was, at the very least, troubling that her husband was on the Central Registry for criminal sexual conduct involving a minor. She reported that she was in the process of divorce, and that they no longer lived together, however the divorce was not finalized and the record is unclear as

to the status of the relationship between the two. However, the trial court endeavored to place the minor child with a relative so it ordered, and petitioner supervised, several visitations so that the minor child could develop a connection with respondent's cousin. However, at the last of four placement hearings, caseworker H. testified that the cousin's circumstances had significantly changed. In particular, a premature and drug-positive newborn (the minor child's half-sibling) had been placed in the cousin's care. She was also taking care of two other children following the sudden death of her mother. She was driving five hours for the newborn's appointments and parenting time, recently had surgery, and was working part-time as an unlicensed home health-care provider and housekeeper for five clients. Caseworker H. described her as defensive and evasive when asked about her income, and frustrated because of the extensive driving, and reported that she was attempting to find financial and other assistance for the baby's care. Caseworker H. testified that, although respondent's cousin behaved appropriately during visits, the minor child did not easily trust others and was not open to quickly building a connection. At the last video visit between respondent's cousin and the minor child, the latter lost interest after 10 to 15 minutes and then went to the foster mother for comfort. The LGAL recommended that the minor child not be placed with respondent's cousin on the basis of her observations during visitations.

On this record, the trial court reasonably concluded that continued placement in the nonrelative foster home, rather than with respondent's cousin, was in the minor child's best interests. Given the dramatic change in respondent's cousin's life relative to caring for additional and special needs children, it was clear that respondent's cousin would not be able to meet the needs of the children recently placed in her care in addition to caring for the respondent's minor child. Also, the minor child had formed a primary bond with the foster mother after being in her care for nearly two years, and also a strong bond with her foster siblings, and was thriving.

Further, the record supports the trial court's conclusion that there was no reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time considering the minor child's age. Respondent argues that he would quickly be able to parent his child after his release from prison, however his past criminal and drug history and history of neglecting his 14-year-old child lead the trial court to a different conclusion. The trial court acknowledged that respondent completed every service available to him. He testified that he was on a waiting list to complete vocational training to be an electrician, and that programs were available to help him find work, and otherwise be successful, when re-entering the community. Also, respondent asserts on appeal that family members would provide him with housing until he was back "on his feet." But these arguments ignore the significant family reunification barriers that respondent would need to overcome.

The proofs show that respondent, unlike the father in *Mason*, did not have steady employment or a suitable home to which he could return upon his release. As the trial court noted, respondent struggled with severe drug addiction for more than 10 years. His criminal history, beginning in 2007, included failure to pay child support, operating a vehicle while intoxicated, operating with a suspended or revoked license, larceny, two incidents of assaulting, resisting, or obstructing a police officer, and two counts of possession of controlled substance. During a term of imprisonment of 18 months beginning in 2015 he participated in substance-abuse treatment, which clearly was unsuccessful considering his most recent conviction. His employment history

consisted of various general laborer jobs, the longest of which was for 18 months. He also had a history of unstable housing.

Unlike the father in *Mason*, respondent had no previously established parent-child relationship, because the minor child was born after he was incarcerated. Caseworker H. testified that respondent had never seen the minor child except by video while he was in the county jail, and that it would take considerable time for a father-child relationship to develop. Moreover, for years, respondent was unable to provide care for his 14-year-old daughter, who was in the primary custody of her mother. In 2009 he owed approximately $10,000 in child support, and in 2019 owed more than $19,000. Respondent admitted that he had little interaction with his older daughter before he was incarcerated. The doctrine of anticipatory neglect recognizes that " '[h]ow a parent treats one child is certainly probative of how that parent may treat other children.' " *In re LaFrance Minors*, 306 Mich App 713, 730; 858 NW2d 143 (2014), quoting *In the Matter of LaFlure*, 48 Mich App 377, 392; 210 NW2d 482 (1973). This minor child will be four and a half years old upon respondent's earliest release date. The trial court correctly held that this minor child should not wait indefinitely for father's rehabilitation. See *In re Dahms*, 187 Mich App 644, 647; 468 NW2d 315 (1991) ("the Legislature did not intend that children be left indefinitely in foster care, but rather that parental rights be terminated if the conditions leading to the proceedings could not be rectified within a reasonable time"), citing MCL 712A.19b(3)(c)(*i*).

These proofs similarly support the trial court's decisions to terminate respondent-appellant's parental rights pursuant to MCL 712A.(3)(c)(*i*), (g), and (j).[2]

Respondent argues that the trial court improperly considered facts that were not in evidence regarding a child's development and formation of attachments with caregivers within the first three years. But those matters are presumably within the common knowledge of the family division of the circuit court were not key factors in the court's determination. Thus, any error was harmless.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Respondent does not argue that the trial court erred in determining that it was in the child's best interest to terminate his parental rights.

Reviewing the record as a whole, we are not left with a firm conviction that a mistake was made in terminating respondent's parental rights.

---

[2] It is unclear whether the trial court found sufficient evidence to terminate respondent's parental rights under MCL 712A.(3)(c)(*ii*). Because only one statutory ground is needed to terminate respondent-appellant's parental rights, it is unnecessary to review factor (c)(*ii*) for clear error. See *In re Trejo*, 462 Mich 341; 365; 612 NW2d 467 (2000).

Affirmed.

/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Sima G. Patel